## McKown *v.* State Mutual Life Assurance Company of Worcester, Appellant.

Argued October 29, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*T. W. Pomeroy, Jr.,* with him *Reed, Smith, Shaw & McClay,* for appellant.

*L. A. Nunnink,* for appellee.

OPINION BY CUNNINGHAM, J., April 19, 1937:

The action below was assumpsit to recover certain disability benefits alleged to be due under a life insurance policy issued to the plaintiff by the defendant company, and for the return of certain premiums paid under protest by plaintiff to defendant, the payment of which plaintiff alleged defendant had waived. A verdict was returned in favor of the plaintiff in the sum of $2,340.65; defendant's motions for judgment n. o. v. or a new trial were denied; and it has appealed from the judgment entered upon the verdict.

The following facts were not controverted: On June 30, 1922, the defendant issued to the plaintiff, after a medical examination by the defendant's examiner, a policy of life insurance in the amount of $5000., for an annual premium of $115.55, payable during plaintiff's life. He was then twenty-eight. This policy contains a total and permanent disability provision, the material part of which reads:

"If the insured hereunder, after the payment of one full year's premium on this policy, or any regular installment thereof, and while no premium hereunder is in default, shall furnish due proof that, before reaching the age of sixty years, because of accident or disease he has become wholly, continuously and permanently unable to pursue any gainful occupation and pre-

sumably for life will be unable to perform any work, mental or manual, or engage in any business for compensation or profit, and that such disability, or the cause thereof, was sustained or contracted after the date hereof, the company will, with the written assent of all the parties in interest, waive the payment of all premiums becoming due under this policy after the expiration of the then current policy year, and pay the insured one per cent of the face amount of this policy, exclusive of any paid up additions, and a like amount each month thereafter during the continuance of said total disability of the insured prior to the maturity of this policy."

Three years later—during June of 1925—the plaintiff became totally and permanently disabled from a disease known as spinal cerebellar ataxia, a rare disease caused by a degeneration of the nerve elements in a certain part of the spinal cord and the cerebellum of the brain. In other words, there was something wrong with the motor apparatus that controlled certain muscles. As a result the plaintiff was obliged to resign his position in the office of the West Leechburg Steel Company where he was employed. In November of 1925 the plaintiff filed with the defendant company a claim for total and permanent disability benefits under the above quoted clause. The claim was allowed by the defendant, and the stipulated disability benefits were paid to the plaintiff from November 27, 1925, to July 25, 1932, and the premiums on the policy were waived from the same date to September 30, 1932. On July 27, 1932, the defendant notified the plaintiff that no further payments would be made and demanded that payment of premiums be resumed. Plaintiff paid the premiums thereafter, under protest, until the date of filing this suit—in the amount of $390.65. The action was brought to compel payment of disability benefits from July 26, 1932, to date of suit, aggregating

$1,950., and to recover back the premiums paid under protest. There is no dispute that the total amount involved is $2,340.65.

The controverted question in the case was whether the plaintiff contracted his disabling disease before or after the date of the policy. This was material under the clause which reads: "and that such disability, or the cause thereof, was sustained or contracted after the date hereof." The first question involved under the assignments is whether defendant's point for binding instructions should have been affirmed. If so, its subsequent motion for judgment n. o. v. should now be granted. The disposition of this question requires a review of the evidence.

At the time of the trial plaintiff was past forty-one years of age. He testified he had always been well up until the first part of June, 1925, and described the disability which he said occurred at that time in these words: "I went to pieces, that is all, I couldn't write, I couldn't talk, I couldn't move." His testimony showed he had enlisted in the army in 1917 and that he was discharged from the service on December 5th of that year for a reason he did not know at that time but learned later. After his discharge he went to work for the Pennsylvania Railroad Company in a clerical capacity for a short time and in March or April of 1918 was employed by the West Leechburg Steel Company in its order department. During a strike in that company's plant in 1919 he did hard physical work in the mill and on the coal tipple. After the strike he returned to his former position in the order department where he remained until he was totally disabled in June of 1925. He also testified that during his lifetime he had participated in strenuous athletics such as skating, swimming and football.

It was developed on cross-examination that plaintiff had sustained an injury of the head through being hit

by the butt of a gun while in the army and was soon thereafter discharged because the surgeon said he had locomotor ataxia. He did not learn the reason for his discharge until 1927 or 1928. In 1920 or 1921 he filed a claim with the Veterans' Bureau for compensation. He said this was done merely as a precaution in the event that his head injury should prove to be serious. At that time his disability was found to be less than ten per cent and he received no compensation. In the winter of 1922 or early in 1923, subsequent to the issuing of the policy, he began to receive a disability award from the government of $8.00 or $10.00 a month which was increased in 1925 to $80.00 a month and then to $100.00.

The defendant offered in evidence the plaintiff's application for disability benefits, dated November 13, 1925, in which he stated: "I went to work, came on gradual over last couple of years until unable to work since May 1, 1925."

Plaintiff had two lay witnesses, one the Secretary and Treasurer of the West Leechburg Steel Company, the other a lifelong friend, who testified that plaintiff showed no signs of illness until two or three months before he was stricken.

Doctor Berg, a general and traumatic surgeon, who examined the plaintiff on September 25, 1935, testified he had the degenerative disease, above mentioned, known as cerebellar ataxia; that it had not resulted from any injury; and that trauma does not play any part in its causation or development. The witness said, "Now, there is a peculiar feature about this condition, which comes like that (snapping the fingers) a man may be all well and suddenly this develops."

The defendant's medical witness, Dr. George Wright, a neurologist, first saw the plaintiff on July 22, 1925. He diagnosed the disease also as spinal-cerebellar-ataxia and had this to say about it: "I feel that from

my experience with similar cases of this sort, where the disease is always slow and insidious in onset, taking years before the picture is clearly defined, that these relatively minor and perhaps confusing symptoms in 1917 were very likely a part of the picture which I saw well developed in 1925."

He also said, in answer to a question, that this form of cerebellar ataxia is a disease which extends back over a period of years and creeps up on an individual very gradually. Dr. Berg and Dr. Wright agree that the diagnosis of locomotor ataxia was a mistake; that cerebellar ataxia and locomotor ataxia have practically the same symptoms and that a mistake in diagnosis may easily be made.

The defendant introduced the records of the United States Veterans' Administration which showed: The plaintiff made his first application for disability benefits on September 11, 1920. His complaint was occasional partial loss of control of lower extremities, nervousness. He was examined in the Marine Hospital and his claim was ruled noncompensable. He was again examined on December 8, 1922, found to have fifteen per cent disability, and benefits were allowed. Plaintiff at that time had an unsteady gait, and an inability to control his legs; his speech was also affected. After an examination made on October 28, 1924, he was awarded total and permanent disability benefits by the Veterans' Administration and has received them ever since.

The record librarian of the St. Francis Hospital testified the plaintiff was first admitted to that hospital on September 20, 1920, where he remained for eight days for various tests. At that time the chief complaint was lack of muscular control below waist line and unsteadiness in the dark. The diagnosis was incipient tabes dorsalis (locomotor ataxia) and questionable lues. He was again in the St. Francis Hospital

from October 28 to October 30, 1924, when he complained of stiffness of muscles of lower extremities and inadequate coordination in walking. The diagnosis was again tabes dorsalis.

In rebuttal the plaintiff stated: "I filed my application with the Veterans' Bureau because, as I have already stated before, the thing to do at that time was, when the laws were passed for veterans, certain allowance by way of compensation, and everybody said and encouraged me to put my name on record, because I have already stated I was discharged from the army by way of disability, so I went over and filed my claim, I put my name on record and as a matter of getting my name on the record."

The issues at the trial, as framed by the pleadings and indicated by our review of the evidence, were purely issues of fact. It was averred by plaintiff in his statement of claim that the defendant "without reason or provocation" discontinued payment of the disability benefits. Defendant in its affidavit replied that the action "was taken for good and sufficient reason, to-wit, information and belief that the cause of plaintiff's disability was contracted prior to the date of said policy." It must be kept in mind that the validity of the policy itself, which is primarily a contract of insurance against death rather than against disability, is not questioned; the controversy is confined to the disability provisions of the contract, and the disability covered by the policy is total and continuous disability "sustained or contracted after the policy became effective."

Plaintiff alleged in his statement that he became disabled in June of 1925 and that his disability had continued to the date upon which he brought suit. Defendant admitted plaintiff became totally disabled at that time, but alleged that his condition was caused by "a congenital degenerative disease of the nervous

system, and was sustained or contracted many years before the date of the policy." The vital issue, therefore, was whether plaintiff had *in fact* contracted the disease before June 30, 1922; if he had, his knowledge or belief concerning the matter at that time was not an issue under the disability provisions of this policy.

Plaintiff had the burden, under the pleadings, of showing that he had been continuously disabled, to the extent specified in the contract, since the date upon which the payments were stopped. There was ample evidence by, and in behalf of, the plaintiff to justify the submission of that question to the jury and there was also the positive testimony of plaintiff and others that he had been able to perform his usual duties for a period of three years after the insurance became effective. When counsel for plaintiff rested his case, the defendant had the burden of coming forward with evidence to support its pleaded justification for discontinuing the payment of benefits. See *Guise v. New York Life Insurance Co.,* 127 Pa. Superior Ct. 127, 191 A. 626. In considering the alleged error in refusing judgment n. o. v., the evidence upon both sides must be read in the light most favorable to plaintiff and he is entitled to the benefit of every reasonable inference deducible therefrom. It was not controverted that he had in 1925 furnished to defendant "due proof" of total and permanent disability at that time. That it took more than seven years for the defendant to discover the alleged facts upon which it now seeks to justify its discontinuance of benefits was a circumstance the jury had a right to consider in connection with all the evidence.

It is argued on behalf of defendant that it is entitled to judgment "because of the paramount status of its documentary evidence." We are not convinced upon an examination of the record that the quotations from the files of the United States Veterans' Administration

or the hospital records were such "admittedly genuine or unattacked documentary evidence" as to entitle them to the effect contended for by defendant's counsel. In so far as they related to dates prior to that of the policy, they merely showed inconclusive tests. It seems to us that the evidence in this case is comparable to that considered by our Supreme Court in the recent case of *Osche v. New York Life Insurance Co.*, 324 Pa. 1, 187 A. 396, and that the records relied upon, when considered in the light of the other medical testimony, bring the case within one of the principles announced in *Evans v. Penn Mutual Life Insurance Co.*, 322 Pa. 547, 186 A. 133, to the effect that whenever disputed questions of fact are presented by conflicting evidence, "whether documentary or oral," the case is for the jury.

The most that can be said is that there was conflicting evidence in this case and that the jury might reasonably have found for either party. For instance, plaintiff's medical expert testified that a peculiar feature about cerebellar ataxia is that it develops suddenly, while defendant's expert stated the disease is slow and insidious, taking years before the picture is defined. It is the exclusive province of a jury to consider and weigh such conflicting evidence.

The only reasons assigned for a new trial were that the verdict was against the law and against the evidence. The trial judge had the advantage of seeing and hearing the witnesses and if he had granted a new trial on the ground that the verdict was against the weight of the evidence we would not be disposed to disturb such an order. The application of the same rule—that in the absence of a showing of abuse of discretion an appellate court will not interfere—requires that the present order refusing a new trial should be treated in the same way. *Cooper v. Metropolitan Life Ins. Co.*, 323 Pa. 295, 186 A. 125.

Judgment affirmed.